**Captain Sheriff SAUDI, Plaintiff,**

**v.**

**S/T MARINE ATLANTIC, Her Equipment and Appurtenances, In Rem (a/k/a M/V Marine Atlantic, Her Equipment and Appurtenances, In Rem, a/k/a M/T Marine Atlantic, Her Equipment and Appurtenances, In Rem), Marine Atlantic, Ltd., John Doe Company, Owner of the Vessel Marine Atlantic, Acomarit Services Maritimes, S.A., Osprey Acomarit Ship Manage-**

ment, Inc., Valmet–Appleton Inc., Appleton Machine Co. (Appleton Marine Division), Appleton Machine Co., Inc., Appleton Marine, Inc., John Doe Company, Designer of the Crane, Koch Petroleum Group, L.P., Jurong Shipyard, Ltd. and United States Trust Company of New York, Defendants.

No. CIV. A. H–99–2367.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 15, 2000.

Joe Alfred Izen, Jr., Izen & Associates, Afton Jane Izen, Attorney at Law, Bellaire, TX, for Captain Sheriff Saudi.

Thomas R. Nork, Bell Ryniker et al., for Marine Atlantic Ltd., John Doe Company, Acomarit Services S A, Osprey Acomarit Ship.

Hollis Horton, Organ, Bell & Tucker, Beaumont, TX, for Appleton Machine Co., Appleton Machine Co. Inc., and Appleton Marine Inc.

F. Michael Stenglein, Weil, Gotshal & Manges, Houston, TX, for United States Trust Company of New York.

Michael Evan Jaffe, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, Michael D. Hudgins, Hudgins, Hudgins and Warrick, Houston, TX, David Kelleher, Stephen, M. Hall, Arent Fox et al., Washington, DC, for Valmet–Appleton Incorporated.

Steven Michael Duble, Hays, McConn, Rice and Pickering, Houston, TX, for Koch Petroleum Group, Koch Shipping Inc., and Koch Supply and Trading Co.

David Patrick Ayers, Fulbright & Jaworski, Innes A. Mackillop, White Mackillop et al., Houston, TX, for Marine Transport Lines, Inc. and Marine Transport Corp.

## MEMORANDUM AND ORDER

HARMON, District Judge.

Pending before the Court in the above referenced admiralty and maritime personal injury action, arising from the May 17, 1999 fall of Plaintiff Captain Sheriff Saudi ("Plaintiff" or "Saudi") from a lifting basket as he was transferred from the tanker Marine Atlantic to the M/V American Discovery because of the collapse of an allegedly defective portside crane on the tanker Marine Atlantic, is *inter alia* Defendants Koch Shipping, Inc. ("KSI") and Koch Supply & Trading Company, Limited n/k/a Koch Petroleum Group, L.P.'s ("KS & T's") (collectively, "Koch's") motion for summary judgment (instrument # 147).

The controlling pleading, Plaintiff's third amended complaint (# 73), alleges six causes of action: (1) negligence and gross negligence under common law against all Defendants; (2) unseaworthy vessel and equipment under maritime law against all Defendants; (3) negligence under the Jones Act against all Defendants; (4) breach of warranty of merchantability under pendant jurisdiction against Defendants Valmet–Appleton, Inc., Appleton Machine Co., Inc., Appleton Marine, Inc. and John Doe Company (designer of the crane), now moot because all these Defendants have been dismissed from this action; (5) strict liability in tort for defective design or manufacture and failure to warn against the alleged designers and/or manufacturers of the crane, Defendants Valmet–Appleton, Inc., Appleton Machine Company, Appleton Marine Company, and John Doe Company, now moot for the same reason as the fourth cause of action; and (6) an action *in rem* against the tanker Marine Atlantic under maritime law.

The movant seeking a federal summary judgment initially must inform the court of the basis for his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the ab-

sence of a genuine issue of material fact and show that he is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.,* 812 F.2d 219, 222 (5th Cir.1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed.R.Civ.P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. He meets this burden only if he shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254, 106 S.Ct. 2505. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)., citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once the burden of proof has shifted to the non-movant, he "must do more that simply show that there is some

metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.,* 477 U.S. at 249–50, 106 S.Ct. 2505. Moreover the non-movant must "go beyond the pleadings and by her own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and opinions are not competent summary judgment evidence. *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salis v. Carpenter,* 908 F.2d 299, 305 (5th Cir.1992); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

KSI and KS & T move for summary judgment on Plaintiff's three causes of action against them. The first alleges negligence and gross negligence based on their responsibility to maintain the crane, but failure to do so. Plaintiff claims that KSI and KS & T knew or should have known that the crane was used to transport people from ship to ship and that improper maintenance would pose an unreasonable risk of harm. Plaintiff further alleges that Defendants demonstrated a conscious dis-

regard for Plaintiff's rights and that Plaintiff is entitled to punitive damages. A second cause of action asserted under maritime law against KSI and KS & T and other Defendants is failure to provide safe and seaworthy vessel and equipment, for which Plaintiff also seeks punitive damages. His third cause of action against KSI and KS & T, as well as the other Defendants, is breach of duty to provide a safe place to work under the Jones Act, 46 U.S.C.app. § 688.[1]

KSI and KS & T maintain they are entitled to summary judgment and dismissal from this suit for two reasons: (1) KSI was only the time charterer of the Marine Atlantic and had no control over the vessel or its equipment, including the crane, at the time of the accident at issue; and (3) KS & T did not own, charter, control, operate, manage, inspect, test or service the Marine Atlantic or the crane at issue, and thus owed no duty and is not a proper party to this action.

KSI and KS & T provide a copy of the Time Charter Party, dated December 24, 1998, with additional typewritten terms attached, as Exhibit A to their motion. As Exhibit B they provide a copy of a Tanker Lightering[2] Voyage Charter Party entered into by American Eagle Tankers, Inc. ("AET") and KS & T on or about September 1, 1996.

KSI and KS & T explain that at the time of the accident in dispute, Plaintiff, an employee of AET, which was contracted by KS & T to conduct lightering operations pursuant to the contract in Ex. B, was being transferred from the tanker Marine Atlantic to the vessel American Discovery, which was owned by AET, in Galveston Lightering Area 2 in the Gulf of Mexico, when he fell approximately fifty feet into the ocean from the crane/basket device located on the tanker Marine Atlantic. Plaintiff was the mooring master provided by AET and was in overall charge of the lightering operations. Ex. C at 1, Ship–to–Ship ("S.T.S.") Superintendent Job Description, signed by Plaintiff. Exhibit C, produced by AET in response to a *subpoena duces tecum*, consists of documents relating to Plaintiff's qualifications and experience.

KS & T contends that it had no relation to the tanker Marine Atlantic other than the fact that it had chartered the M/V American Discovery to facilitate the lightering operations. Plaintiff has not alleged that the M/V American Discovery was unseaworthy, so KS & T is not a proper party to this suit. KS & T's only tie to the tanker Marine Atlantic is the Time Charter Party which it entered into with the owners of the tanker Marine Atlantic.

KS & T argues that marine law applies to Plaintiff's negligence and unseaworthiness claims because the accident occurred in navigable waters, at the time Plaintiff was engaged in the traditional maritime activity of performing his duties as AET's mooring master, and Plaintiff's injury was allegedly caused by the collapse of a portside crane on the tanker Marine Atlantic and part of the vessel's equipment. *Green v. Vermilion Corp.*, 144 F.3d 332, 336, 338, 341 (5th Cir.1998)(for admiralty jurisdiction a tort must have a maritime locality

---

1. The other causes of action are not against KSI and KS & T. Plaintiff's fourth and fifth causes of action are against the designer and/or manufacturer of the crane, and his sixth is an action *in rem* against the ship under maritime law.

2. "Lightering is the process of transferring liquid cargo in bulk between tank vessels." Marine Atlantic Ltd. and Osprey's motion for partial summary judgment addressing Plaintiff's Jones Act and unseaworthiness claims and motion to strike jury demand (# 192) at 1 n. 2.

and "the facts and circumstances of the claim must bear a significant relationship to traditional maritime activity," as determined by examining four factors: the functions and roles of the parties, the types of vehicles and instrumentalities involved, the causation and the type of injury, and traditional concepts of the role of admiralty law), *cert. denied,* 526 U.S. 1017, 119 S.Ct. 1251, 143 L.Ed.2d 349 (1999).[3] Saudi was injured in navigable waters aboard a tanker vessel while performing a traditional maritime activity of mooring the vessel for lightering and his injury allegedly was caused by corrosion of the vessel's portside crane.

 Furthermore, as a matter of Fifth Circuit law, a time charterer as a general rule assumes no liability for negligence of a vessel's crew or the unseaworthiness of the vessel unless the plaintiff shows that the charter parties intended otherwise. *Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236, 242 n. 5 (5th Cir.), *cert. denied sub nom. Erikson v. Mallard,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). Clear express language is required in the time charter to rebut the presumption that the charter parties did not intend to shift the responsi-

bility for negligence of a vessel's crew or unseaworthiness of a vessel to the charterer. *Kerr–McGee Corp. v. Ma–Ju Marine Services, Inc.,* 830 F.2d 1332, 1343 (5th Cir.1987). Defendants explain that these rules arise from the distinction between demise and non-demise charters. Under a demise, or bareboat charter, the owner of the vessel transfers full possession and control to the charterer, which furnishes the crew and maintenance for the vessel. Thus the demise or bareboat charterer is the owner *pro hac vice* of the vessel for the duration of·the contract and is therefore responsible *in personam* for the negligence of the crew and the unseaworthiness of the vessel. *Forrester v. Ocean Marine Indem. Co.,* 11 F.3d 1213, 1215 (5th Cir. 1993). Under a non-demise charter, which encompasses both time charters and voyage charters, the charterer may use the vessel for a specified period of time, but the vessel owner retains primary possession and control of the vessel and the time charterer does not control the details of its operation. Therefore the time charterer is not liable for any negligence of the crew or unseaworthiness of the vessel. *Id.*

 The time charterer may, however, be liable to third parties for its own

---

**3.** In *Green,* the Fifth Circuit, noting that "[a]dmiralty has traditionally been concerned with furnishing remedies for those injured while traveling navigable waters" and that "the relationship to traditional maritime activity required for the invocation of admiralty jurisdiction" may be satisfied by maritime employment, found that Green was injured in the course of his employment while performing the traditional maritime activity of mooring a vessel, that Vermilion owned the vessel on which Green fell, that the vehicle involved was a vessel routinely employed on navigable waters, that the injury was caused by an unkept deck, that Green's injury was not uncommon in the maritime context, and that application of maritime law and maritime jurisdiction does not offend long evolved principles of maritime law. *Id.* at 336. Con-

cluding that federal admiralty rights have supremacy over state law where uniformity is important and rejecting any limitation of admiralty law only to wrongful death suits, the Fifth Circuit held that the exclusive remedy provision of the Louisiana Workers' Compensation Act did not bar Green from asserting a maritime negligence claim against Vermilion for the nonfatal injuries he sustained during the course of his employment while on navigable waters. *Id.* at 341. It observed, "The key factor is maintaining uniformity in admiralty law and preserving the rights granted to maritime workers, not the degree of harm the worker suffers. An action for negligence has long been a vestige of general maritime law; subjecting it to the ebbs and flows of state legislation would disrupt the essential features of admiralty law." *Id.*

negligence. *Id.; Graham v. Milky Way Barge, Inc.*, 811 F.2d 881, 893, *op. superseded on rehearing*, 824 F.2d 376, 387–88 (5th Cir.1987)(time charterer was independently negligent in dispatching vessel to perform in unsheltered open reaches of the Gulf of Mexico in bad weather). The Fifth Circuit, in *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1517–20 (5th Cir.1996), observed that case law suggests that a time charterer owes a hybrid duty, arising from tort and contract law, to persons with whom it has no contractual relationship, to exercise control in a reasonably prudent manner within the sphere of activity over which it exercises at least partial control, e.g., in choosing the timing, route, cargo, and general mission of the vessel's voyage. *Id.* at 1517, 1520. For instance, if the time charterer orders the vessel's crew to continue working despite dangers threatened by poor weather, the time charterer is not absolved of responsibility for any injury or damage. *Id.* at 1518, 1521; *Brown v. Link Belt Division of FMC Corp.*, 666 F.2d 110 (5th Cir.1982); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir.1983); *Randall v. Chevron USA, Inc.*, 13 F.3d 888 (5th Cir.), *modified*, 22 F.3d 568, *cert. denied*, 513 U.S. 994, 115 S.Ct. 498 (1994). Thus a time charterer is only liable for negligence arising from its exercise of control within traditional spheres of activity, such as designating route, mission, cargo, or timing of the assignment. *Hodgen*, 87 F.3d at 1520. The parties may vary the traditional assignment of control by contract or custom, but without such an allocation, a time charterer owes no duty beyond the traditional spheres of timing, route, mission, and cargo. *Id. See also Chisholm v. Maryland Inland Transportation Co.*, No. 99–0002, 2000 WL 64492 (E.D.La.2000)(applying rules set forth in *Hodgen* and holding that where the plaintiff, who was injured while carrying a hose from a barge to a vessel with other crew members, made no allegations that and there was no evidence that, at the time of his injury, a time charterer was acting in one of the traditional spheres of a time charterer's activity and it was uncontested that the time charterer did not direct the crew to move the hose, the time charterer was not liable as a matter of law); *Kerr–McGee Corp.*, 830 F.2d at 1340–42 (time charterer not liable for any negligence related to condition of vessel where custom and terms of time charter party left control over and responsibility for safety of vessel solely in hands of vessel owner); *Zepherin v. Conoco Oil Co.*, 884 F.2d 212 (5th Cir.1989).

Defendants emphasize that in the time charter between KSI and the owners of the tanker Marine Atlantic, no provision varies the traditional allocation of responsibilities between the time charterer and the vessel owner. Thus all equipment located on the vessel, including the disputed portside crane, was the responsibility of the vessel owners. The transfer of Plaintiff from the M/V Marine Atlantic to the vessel American Discovery by that crane was within the exclusive control of the crews of the two vessels. They maintain that Plaintiff has not alleged that the timing of this operation had anything to do with the accident. Thus as a matter of law, they insist, KSI is not liable to Plaintiff for the alleged unseaworthiness of the vessel or for negligence under maritime law.

■ Nor, contend KSI and KS & T, are they liable under the Jones Act. The Jones act provides seaman with a suit for damages against their employers for injuries incurred while at sea. *Volyrakis v. M/V Isabelle*, 668 F.2d 863, 865 (5th Cir.1982); *Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 235–36 (3d Cir.), *cert. denied*, 502 U.S. 919, 112 S.Ct. 329 (1991). Plaintiff was an employee of American Eagle Tankers ("AET") at the time and therefore

cannot recover from KSI and KS & T under the Jones Act.

Plaintiff's response in opposition, which the Court finds extremely difficult to follow, states that AET was employed as an independent contractor by the Koch Defendants to engage in lightering operations on S/T Marine Atlantic. He argues that a fact issue exists whether the Koch Defendants "tested, inspected or certified" the vessel, including its portside crane, as alleged in the complaint. If they did, .they may be liable to Plaintiff for his first three causes of action against them: failure to properly maintain or inspect the crane, demonstrating a conscious disregard for Plaintiff's rights; failure to provide Plaintiff a safe and seaworthy vessel and equipment; and breach of their duty to provide Plaintiff with a safe workplace. As for the Jones Act claim, Plaintiff argues that he stands in the position of an employee to an independent contractor, as established by admissions and other evidence.

Although the Koch Defendants argue that KSI had no control over the vessel or its equipment, Saudi points to the deposition of a Koch-designated witness, R.E. Brown, who conceded that Koch "might have had personnel who remained onboard" and had the right of control of the vessel under the charter contract. Ex. A, Brown Dep., p. 179, 11. 17–25; p. 180, 11. 1–19. Plaintiff asserts that Koch personnel, Joseph Tan and Frances Tan, were responsible for monitoring the operations of the vessel and would have been aware that when the vessel was first vetted [4] by Koch, the quadrennial inspection of the portside crane required by the terms of the vessel's ship registry in Liberia had not been performed. Affidavit of Captain

Saudi, Ex. B. Saudi hopes to show that Joseph Tan was a cargo operations employee of Koch, that Francis Tan was an outside contractor hired by Koch as a cargo inspector and that both were on board and knew of continued operation of the vessel without a quadrennial inspection of the cargo hose crane after the charter contract was entered into. Such knowledge is imputable to the Koch Defendants who are accordingly liable for a failure to warn. Ex. H, letter from Koch to owner of vessel requesting that Joseph Tan and Frances Tan be accommodated onboard.

Saudi claims there is an issue as to whether the Koch Defendants are charterers. The issue is not ripe for summary judgment because discovery is not complete, urges Saudi.

Saudi represents that it is undisputed that Koch Defendants vetted the vessel and its equipment and performed a survey conducted by PacMarine Services. Ex. E and H. The vetting would or should have revealed the dangerous condition of the portside crane, he argues. Restatement (Second) of Torts § 324A. Section 324A provides,

**Liability to Third Person for Negligent Performance of Undertaking**

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if

4. According to Plaintiff, vetting "is the process whereby companies chartering a vessel ... inspect the vessel to determine its ability to perform under its contract." He states

that Koch Defendants have admitted that the vetting inspection and survey include the safety of the ship.

(a) his failure to exercise reasonable care increases the risk of such harm; or

(b) he has undertaken to perform a duty owed by the other to the third person; or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Saudi argues that the Supreme Court refers to this rule as the "Good Samaritan" doctrine. *United States v. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The Third Circuit has examined it in the context of government inspections and Section 403 of the Restatement of Torts (Second), providing for liability where one provides a chattel known to be dangerous for the use of another who is thereby injured. Saudi claims that Koch knew or should have known of the dangerous condition of the cargo hose cranes and had a duty to warn Saudi of such dangers. *Reese v. Mercury Marine Division of Brunswick Corp.*, 793 F.2d 1416 (5th Cir. 1986); Section 324A of the Restatement of Torts (Second). He also submits his own affidavit to demonstrate that he and his employer, AET, relied on Koch Defendants' reputation for safety in the industry, based on its vetting program, when he allowed himself to be lifted aboard the vessel chartered by Koch. He asserts that since Koch Defendants undertook the vetting, they had a duty to perform it competently. Because they failed to do so, they are liable to Saudi for negligence and failure to warn.

Saudi further claims that under normal vetting practice in the industry, Koch Defendants, as the time charterer, would have received safety certificates on the vessel's cranes, including the one that injured Plaintiff, even though Brown claimed that Koch had no reason to demand a certificate for the vetting. Saudi insists that he has had more experience than Brown in the maritime industry and vetting of ships and therefore Brown's statement that Koch had no reason to demand such a safety certificate is refuted by Saudi's affidavit and other admissions binding on Defendants. Ex. A, Brown's Dep., p. 222, 11. 12–15, p. 224, 11. 2–16; Ex. 58, Brown Dep., p. 224, 11. 2–8, describing Koch's vetting practices. Saudi points to a contradiction in statements by Brown, i.e., that he only presented Koch's vetting program internally to Koch people and his conflicting statement that it was presented to managers of various boats and shipping people. He claims that Koch obtained a reputation in the maritime industry for chartering safe vessels based on its vetting program, disseminated in a "PowerPoint Presentation," a slide show.[5] Ex. 58; Brown Dep. at p. 224, Ex. A to Plaintiff's Response.

Saudi further claims that because the Koch Defendants provided the vessel S/T Marine Atlantic for use in lightering operations under the contract with AET, the Koch Defendants are liable under Section 388 of the Restatement of Torts (Second) (1965), "Chattel Known to Be Dangerous for Intended Use," which provides,

---

**5.** The Court notes that Saudi is misrepresenting Brown's testimony by manipulating Brown's first remark out of context. Brown testified during his deposition that the Powerpoint presentation of Koch's vetting program was made "to managers of various boats, to shipping people ... to explain Koch's purpose for vetting vessels." When immediately asked if "the presentation is made to boat owners or people in the maritime industry that are *not* employed by Koch," Brown replied, "No it's made internally to Koch people" and that to his knowledge it had never been shown or disseminated to anyone other than Koch employees. Brown Dep. at 224–25, Ex. A to Plaintiff's Response.

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to know that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

See also *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 923 (9th Cir.1987), and *Edwards v. Mazor Masterpieces, Inc.,* 295 F.2d 547 (D.C.Cir.1961). The Court observes that neither of these cases is a maritime suit, nor related to a time charterer.

In an amended reply, the Koch Defendants insist Saudi has presented no summary judgment evidence demonstrating that they are liable to him. Instead Saudi has argued without any evidence that Koch operated the vessel, that a fact issue exists as to whether Koch tested, inspected or certified the vessel, and that Koch should have discovered the latent defect in the crane that caused his injuries. According to the Koch Defendants, Saudi has misrepresented the testimony of Koch executive Robert E. Brown in an effort to show that Koch controlled operations of the vessel, cites no authority and provides not evidence for his conclusory argument that Joseph Tan and Frances Tan were responsible for monitoring the operations of the tanker Marine Atlantic, and the mere fact that they went on board at some time before Saudi's accident does not show that they had anything to do with inspecting the crane or operating the vessel. Indeed Brown's testimony explains that Joseph Tan was responsible for cargo operations and Francis Tan was hired for cargo loss and operations expertise. Brown's Dep. at p. 180, 11. 20–23, Ex. A to Plaintiff's Response. Contrary to Saudi's contentions, Koch Defendants claim that it is undisputed that Acomarit was the operator of the vessel throughout Koch's time charter of it.

Moreover, Saudi contends that Koch is liable under the Restatement (Second) of Torts § 423A because it did not properly inspect the vessel and discover the crane's latent defect and that there is an issue as to whether Koch inspected the vessel. Koch argues that the evidence reflects that Koch did not inspect the vessel or the crane, not to mention not discover any latent defect in the crane. Koch acknowledges that it hired an outside contractor, PacMarine Services, to do an on-hire survey of the vessel. PacMarine's resulting report on that January 21, 1999 survey of the tanker Marine Atlantic states that its purpose was "to determine the general condition of the cargo tanks and main deck areas in way of cargo tanks and to ascertain the bunkers remaining on board at the time of delivery of 'On Hire.'" Ex. D. Such a survey, even if it had been done by Koch, would not have given rise to any liability on Koch's part. In addition, Koch accuses Saudi of altering copies of the survey in its Exhibit E.

Koch also emphasizes that Saudi presents no proof that the vessel and its lifting cranes were required to have a quadrennial inspection or that Koch was in any way responsible for such an inspection. Koch notes that in Saudi's response to Marine Transport's renewed motion for summary

judgment, 2.8 at p. 7, Saudi even states that the quadrennial inspection is a misnomer and that by the early 1990's such inspections, which are part of the classification of a ship, were only required every five years. Richard Farman explained in his deposition that these classification inspections may not even include the lifting cranes. Ex. B to Plaintiff's Response to Marine Transport's Renewed Motion for Summary Judgment at pp. 7–17. Furthermore, Koch points out, Acomarit has produced documents showing that the portside crane had been inspected and certified within a month before the commencement of Koch's time charter party and less than six months prior to Saudi's accident. Ex. E to Koch's Amended Reply, Acomarit documents Nos. 296 and 297, showing the crane was certified and tested on March 27, 1998 and again on December 8, 1998. Furthermore, Koch's vetting file on the Marine Atlantic shows that the vessel was in the shipyard conducting its fourth special survey in December 1998 during Koch's vetting process. Ex. F, Koch Doc. No.27. Thus even if the crane was not properly inspected, tested, or certified, there is no fact issue as to Koch's non-liability as the time charterer.

Koch further insists and demonstrates that there is no conflict in Brown's testimony about the presentation of Koch's vetting program and that Saudi has simply misrepresented Brown's testimony without any supporting evidence. Ex. A to Saudi's response, pp. 224–25. The managers of boats and shipping people to whom Brown stated the Powerpoint Presentation of Koch's vetting program was made are Koch personnel, and thus the presentation was only "made internally to Koch people." *Id.* at pp. 224–25. Koch also shows that Brown's representations were accurate, that KSI was the time charterer of the Marine Atlantic, and that KS & T n/k/a Koch Petroleum Group, L.P., contracted with Plaintiff's employer, AET, for lightering services. The evidence further demonstrates that Koch had no control over the operations of the vessel or its equipment, including the crane.

In addition, Koch argues that the summary judgment evidence demonstrates that its vetting cannot serve as a basis for liability here. Saudi relies on the Restatement (Second) of Torts § 324A for his argument that Koch's vetting would or should have revealed the dangerous condition of the portside crane. The evidence, to the contrary shows that Koch did not render services to "another" under its vetting program, the purpose of which was an internal determination whether a vessel should be taken under charter. Brown's deposition testimony described the vetting of the Marine Atlantic and made clear that during it no inspection of the vessel was done as part of the analysis. Brown Dep. Ex. E at pp. 38–43. Furthermore, Koch emphasizes, Saudi fails to cite a single case in which a time charterer of a vessel was held liable based on § 324A. All cases cited by Saudi are distinguishable from this one, Koch urges, and are not decided under general maritime law; he discusses two in detail: *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 821, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)(holding that the discretionary function exception to the Federal Tort Claims Act precluded tort actions based on the alleged negligence of the Federal Aviation Administration in failing to check certain thing in the process of certificating the aircraft for use in commercial aviation); and *Merklin v. United States,* 788 F.2d 172 (3d Cir.1986).

Koch reiterates that the Fifth Circuit has held that a time charterer assumes no liability for the vessel's crew or unseaworthiness of the vessel unless the plaintiff demonstrates that the charter parties intended otherwise. *Mallard,* 634 F.2d at

242 n. 5. Only where there are no federal cases or established federal admiralty laws should a court look to general common law and, in particular, the Restatement (Second) of Torts, to find the governing law. *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir.1992).[6]

Koch did not operate the vessel or inspect, test or certify the vessel or its portside crane and had no duty to do so, Koch maintains. Nor did it owe a duty to anyone with respect to its vetting of the Marine Atlantic. Koch concludes that Saudi has failed to present any evidence or raise any genuine issues of material fact of liability.

In reply Saudi refers to the affidavit of his expert witness, Dr. Salah E. Mahmoud, filed as Ex. D to his Opposition (# 166) to the motion for Summary Judgment of Defendant Marine Transport, to controvert the testimony of Marine Transport Lines' Engineer Richard Farman, on the issue of whether a quadrennial or quintennial inspection is required. He contends that

Koch has confused a lifting survey test with a quadrennial survey test. Dr. Mahmoud's affidavit states that a quadrennial test, unlike the lifting test, requires that all moving parts of the lifting item, such as a portside crane, be disassembled and inspected to insure that a catastrophic failure does not occur. Saudi further insists that Dr. Mahmoud's affidavit demonstrates that the condition of the moving parts of the portside crane exhibited at least fifteen years of extended corrosion and thus refutes any claim that any competent quadrennial survey or vetting of the crane was performed in 1998. Saudi further points out that the Operator of the Marine Atlantic certified that the last date the crane had been lift-tested was March 27, 1998, not December 1998.

Saudi emphasizes that the most important fact establishing Koch Defendants' liability here is that they supplied the vessel to Saudi's employer for use in performing the lightering contract that AET had entered into with them and that Koch directed AET to send AET's employee, Saudi, to

---

**6.** Koch points out that under the "Good Samaritan" rule, which has at times been applied under general maritime law, the defendant must have undertaken to perform the specific task he is charged with having performed negligently, i.e., the Good Samaritan's duty is measured by the scope of his undertaking. *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir.1982)(suit against the United States for allegedly negligent inspection of a vessel by the Coast Guard shortly before it exploded). Even when the defendant specifically undertook the task and allegedly performed it negligently, he is liable only where (1) his failure to exercise reasonable care increases the risk of harm; (2) he has undertaken to perform a duty owed by another to a third person; or (3) the harm is suffered because of reliance of the other or the third party upon the undertaking. Restatement (Second) of Torts § 324A. ·

Even if Koch had inspected the vessel, it insists that failing to discover a risk by inspections does not increase the risk of harm. *Pa-*

*tentas*, 687 F.2d at 716–17; *Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir.1998). There is no evidence that Koch did anything to increase the risk to Saudi from the portside crane. Nor is there evidence that Koch undertook a duty which anyone else owed to Saudi or that Saudi suffered harm because of anyone's reliance upon the alleged undertaking. *Patentas* rejected the argument that once the Coast Guard undertook inspection of the vessel, it engendered reliance and was obligated to use due care. While Saudi's affidavit states that he relied on Koch's reputation in the marine industry for carrying out competent vetting and safety inspections, it does not state that he relied on any specific inspection or affirmative action by Koch with respect to the Marine Atlantic. *See also, Good v. Ohio Edison*, 149 F.3d at 421 (finding that testimony that mariners generally rely on Coast Guard's dissemination of information failed to address whether the particular accident involved detrimental reliance on the part of the pleasure boat owner).

board the Koch-chartered S/T Marine Atlantic to carry out lightering operations for Koch's ultimate economic benefit and business purpose. He insists that the sections 388 and 392[7] of the Restatement of Torts (Second) governing the liability of "persons supplying chattels for the use of others" establishes Koch's vetting as a basis for its liability. Moreover, Saudi urges that sections 388 and 392 are applicable under federal maritime law. *DiRago v. American Export Lines, Inc.*, 636 F.2d 860, 864 (3d Cir.1981)(applying Restatement (Second) of Torts § 452 to shipowner's failure to inspect cargo where shipowner knew or had reason to know condition of cargo created an unreasonable risk of and caused harm to longshoreman); *Rich v. United States Lines, Inc.*, 596 F.2d 541 (3d Cir.1979)(imposition of section 302A liability on a ship owner for negligence resulting in injury to a longshoreman, where an actor realizes or should realizes that an act or omission involves unreasonable risk of harm to another, requires as a prerequisite the existence of a duty to take some action to remedy the dangerous condition); *Houston–New Orleans, Inc. v. Page Engineering Co.*, 353 F.Supp. 890, 899 (E.D.La.1972)(adopting Restatement (Second) of Torts sections 395 and 392 in imposing liability on supplier of defective equipment and on repairman for failure to discover defect in a dragline control panel).[8] Saudi maintains that Koch chartered and supplied a defective chattel, the vessel,

to AET, which stood in the position of an independent contractor, for a business purposes, i.e., lightering operations, and is thus liable for his injuries. Saudi files his own person affidavit in support.

■ After reviewing the record and the applicable law, this Court agrees with the Koch Defendants that under clear Fifth Circuit law a time charterer is not liable unless the cause of harm is within a time charterer's traditional sphere of control and responsibility. Generally the time charterer who has no control over the operation of a vessel has no liability for the negligence of the crew or the unseaworthiness of a vessel unless the plaintiff shows that the parties to the time charter intended otherwise. *Kerr–McGee*, 830 F.2d 1332; *Mallard*, 634 F.2d at 242 n. 5. Saudi has failed to show that the parties intended Koch Defendants to have responsibility for the alleged unseaworthiness of the vessel. A time charterer's traditional sphere of control also does not extend to providing a safe means of ingress and egress from a vessel. *Hodgen*, 87 F.3d at 1520. It is axiomatic that without the existence of a duty, there can be no negligence, as even the cases relied upon by Saudi reflect. *See, e.g.*, *Rich*, 596 F.2d 541 (imposition of section 302A liability for negligence, where an actor realizes or should realizes that an act or omission involves unreasonable risk of harm to another, requires as a prerequisite the existence of a duty to take some action to remedy the dangerous condition).

7. Restatement of Torts (Second) Section 392 (1965) provides,

> One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by whose persons for whose use the chattel is supplied

> (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
>
> (b) if he fails to exercise reasonable care to discover its dangerous condition or character and to inform those whom he should expect to use it.

8. The court notes that in citing these two cases, Saudi ignores Koch's distinctions between obligations of a time charterer and of a vessel owner. Moreover, the instant suit does not involve a longshoreman.

Thus the sections of the Restatement (Second) of Torts that Saudi seeks to apply to Defendants cannot create liability for Koch Defendants because under their time charter they had no responsibility for the condition of the portside crane. Moreover, Saudi has failed to demonstrate that KS & T was involved in any way with the M/V Marine Atlantic and Saudi's injury.

Accordingly, the Court

ORDERS that KSI and KS & T's motion for summary judgment is GRANTED.